## Affidavit of Sheila R. Magoon

I, Sheila R. Magoon, hereby declare as follows:

1. I am a Special Agent with the Federal Bureau of Investigation and have been employed as such since September 2003. I have been assigned to the Economic Crimes Squad in the Boston Field Office since 2004. I am also a certified public accountant.

2. I make this affidavit in support of a criminal complaint charging MANUEL PONCE VAZQUEZ with mail fraud in violation of 18 U.S.C. § 1341.

3. As described further below, I have probable cause to believe, and do believe, that, beginning no later than August 2013 and continuing through at least February 2016, VAZQUEZ used a fraudulent check scheme to defraud law firms and other entities, including one law firm that I refer to as "the Law Firm" throughout this affidavit. To defraud the Law Firm, someone—likely VAZQUEZ—sent the Law Firm a counterfeit cashier's check and, using a ruse, convinced the firm to deposit the check and forward most of its purported value to a bank account VAZQUEZ controlled, which he had opened using an alias. VAZQUEZ withdrew or transferred nearly all of the money sent to him by the Law Firm within a day of its arrival. Including the $97,035 sent to him by the Law Firm, I estimate VAZQUEZ has obtained at least $1 million through this scheme.

4. The facts in this affidavit come from my personal involvement in this investigation, interviews with witnesses, and my review of documents, records, and information provided by others, including the Braintree Police Department. In submitting this affidavit, I have not included every fact known to me about this investigation. Rather, I have included only those facts that I believe are sufficient to establish probable cause.

## The Scheme to Defraud the Law Firm

5.      On or about January 13, 2016, an attorney in the Law Firm's Santa Clara, California office ("the Attorney") received an e-mail from Person 1, who gave a name to the Attorney, but whose true identity is not known to me. Person 1 said that he worked for an architectural firm in London, England. In that e-mail, or in a subsequent phone call with the Attorney, Person 1 said he was seeking the assistance of the Law Firm in collecting a debt of $97,500 from a property owner in California for whom the architectural firm had purportedly done some design work. The Attorney used the internet to research both the architectural firm and the supposed property owner. She found a website for the architectural firm, and that the person named by Person 1 did own the property identified by Person 1.

6.      After conducting her research, the Attorney e-mailed Person 1 paperwork necessary to retain the Law Firm, including instructions for Person 1 to send the firm a $3,000 retainer. Person 1 returned the completed paperwork, but did not send the money for the retainer.

7.      On or about January 19, 2016, Person 1 called the Law Firm and spoke with the Attorney. He told her that the parties wanted to settle the matter between themselves, without getting the courts involved.

8.      On or about January 25, 2015, the Attorney received a United States Postal Service Priority Mail Express package ostensibly mailed by the California property owner. The package contained a cashier's check for $97,500 made out to the Law Firm. In the memo line, the check said, "F/B/O [Person 1]."

9.      Although the return address on the package belonged to the California property owner, the tracking number reveals that the package was actually shipped from a post office in Braintree, Massachusetts, on or about January 23, 2016 (a fact the Law Firm did not investigate

at the time). The Postal Service later told the Braintree Police Department that the package had been dropped in a postal box in Braintree, Massachusetts, where there was no video surveillance.

10. After receiving the check, the Attorney called Person 1 and asked him about the check. Person 1 said he was not sure why the property owner had sent the check to the Law Firm and acted as though he did not know what to do with the check himself.

11. On or about January 27 or 28, 2016, Person 1 called the Attorney and asked her to deposit the check into the Law Firm's account, keep whatever fee the firm would charge for its services, and forward the remainder to him. Person 1 provided information for an account in London, England, in the name of Diamond Architects.

12. The Law Firm deposited the cashier's check in the firm's account on or about January 28. The next day, the Law Firm learned that the check had cleared.

13. Also on or about January 29, 2016, the Attorney received another e-mail from Person 1 in which he said that wiring the money directly to England may be difficult. He asked her to wire the money to an intermediary named Antoine Nourrain and provided the Attorney with Nourrain's supposed bank account information and address, which was on Gardner St. in Chelsea, Massachusetts ("the Gardner St. address"). According to the e-mail, Nourrain's bank account, which ended in 9335 ("the 9335 account"), was maintained at the Citizens Bank branch at 77 Franklin St. in Boston, Massachusetts.

14. On or about February 1, 2016, the Law Firm wired $97,035 to the 9335 account, retaining $435 as its fee, and using $30 to pay the wire transfer fee.

15. On or about February 2, 2016, the Law Firm learned from its bank that the cashier's check was fraudulent. The deposit of the cashier's check was debited from the Law Firm's account.

**VAZQUEZ's Aliases – Antoine Nourrain**

16.     The 9335 account was opened in or about May 2015 by a man using the name Antoine Gerard Nourrain, who claimed to be from Brussels, Belgium. He used Belgian passport number EJ651433 for identification and gave the Gardner St. address as his address in the United States. He gave the bank a phone number ending in 4287.

17.     There was little activity in the 9335 account until on or about February 1, 2016, when the $97,035 wire from the Law Firm arrived. After the wire arrived, the balance of the 9335 account was $97,338.82. (There was a prior balance of $303.82.)

18.     On or about the evening of February 1, 2016, an adult man in a dark coat and flat cap[*] withdrew $10,000 from the 9335 account at a branch in a Stop & Shop supermarket in Quincy, Massachusetts. Based on a bank surveillance photo of the man, I believe him to be VAZQUEZ. (Weeks later, during the February 26, 2016 search of VAZQUEZ's home, described below, officers found a Citizens Bank receipt for this $10,000 withdrawal. According to that receipt, the balance remaining in the account after the withdrawal was $87,338.82. This figure matches the balance for the 9335 account on records obtained from the bank.)

19.     On or about February 2, 2016, a man made three cash withdrawals from the 9335 account within the span of approximately two hours and twenty minutes. All three withdrawals were made in person by an adult man with trimmed, gray facial hair, and dark eyebrows, wearing a dark coat and flat cap. Based on bank surveillance photos of the man at each location, I believe him to be VAZQUEZ. In total, VAZQUEZ withdrew at least $52,000 in cash from the 9335 account on February 2.

---

[*] Sometimes called a newsboy cap, longshoreman's cap, golf cap, scally cap, or various other names.

20.     VAZQUEZ made the first of these withdrawals—$15,000 cash—at approximately 12:11 p.m. from a Citizens Bank branch in Braintree, Massachusetts. There, he presented the teller with a Belgian passport for identification. VAZQUEZ withdrew another $15,000 in cash from a different Citizens Bank branch in Braintree at approximately 1:10 p.m., again using a Belgian passport as proof of identity. At approximately 2:30 p.m., VAZQUEZ withdrew $22,000 in cash from a Citizens Bank branch in Milton, Massachusetts.

21.     Also on or about February 2, 2016, a wire in the amount of $30,000 was transferred from the 9335 account to a bank account in Belgium. According to a Citizens Bank wire transfer request form found in VAZQUEZ's residence during the February 26, 2016 search described below, the customer requesting the transfer identified himself as Antoine Gerard Nourrain using Belgian passport number EJ651433. The form gives Nourrain's phone number as ending in 4287.

22.     Including the wire transfer and VAZQUEZ's cash withdrawals, by February 2, VAZQUEZ had removed $92,000 of the $97,035 sent by the Law Firm. In addition, on or about February 2, 2016, someone made four additional ATM withdrawals from the 9335 account. (I have not been able to view surveillance images associated with these withdrawals.) Each of those withdrawals was for $600 and was made from a bank branch on Hancock St. in Quincy, Massachusetts.

### VAZQUEZ's Aliases – Daniel Hendrickx

23.     On or about January 27, 2016, a man using the name Daniel Hendrickx registered to have his mail delivered to a Regus location in Quincy, Massachusetts. (Regus is an international company, founded in Brussels, Belgium, that offers virtual offices and mailboxes to clients.) As proof of identity, the man provided a German passport and license. He gave the Gardner St. address for his home address.

24. On or about February 3, 2016—the day after the withdrawals from the 9335 account—a man using the name Daniel Hendrickx opened new checking and saving accounts at the Eastern Bank branch at 731 Hancock St. in Quincy, Massachusetts. The man used a German passport and license as proof of identity.

25. On or about February 18, 2016, an Eastern Bank representative notified police that Hendrickx was in the 731 Hancock St. branch. When two detectives arrived at the bank, they observed the man identified as Hendrickx driving a black Audi registered to a female resident of Quincy, Massachusetts. Later, Braintree police identified Hendrickx as VAZQUEZ.

26. Searches of public and law enforcement databases, the state registry of vital records, and social media revealed that VAZQUEZ was married to the woman in whose name the Audi was registered, and that one of her prior addresses was the Gardner St. address.

27. On various dates in late February 2016, Braintree police surveilled VAZQUEZ driving the Audi to locations including a small business in Quincy owned by his wife. On at least one of those occasions, VAZQUEZ was wearing a dark coat and flat cap, as in the bank surveillance photos.

### The February 26, 2016 Searches

28. On or about February 26, 2016, the Braintree police arrested VAZQUEZ for larceny and identity theft and obtained court-authorized warrants to search the Audi and his home. They searched both locations the same day.

29. In a search of VAZQUEZ incident to his arrest, the police discovered, among other things, a cell phone, three identification cards bearing VAZQUEZ's photograph, and fourteen credit cards in seven different names. Four of the credit cards were in VAZQUEZ's name, three were in Hendrickx's, two were in Nourrain's, and one was in the name of VAZQUEZ's wife. Four of the cards were in three names not identified in this affidavit.

30. In the Audi, the police found, among other things:

   a. A Belgian passport (number EJ651433) and identification card in Antoine Nourrain's name, but bearing VAZQUEZ's photograph;

   b. A Belgian identification card in VAZQUEZ's name and bearing VAZQUEZ's photograph;

   c. A German passport and identification card in Daniel Hendrickx's name, but bearing VAZQUEZ's photograph;

   d. A Spanish passport in VAZQUEZ's name bearing VAZQUEZ's photograph;

   e. Credit cards in Nourrain and Hendrickx's names;

   f. United States Postal Service shipping envelopes;

   g. Various bank transaction receipts, ATM receipts, bank statements, and wire transfer receipts;

   h. A Western Union receipt;

   i. A Macbook Air laptop computer;

   j. A MyPassport Ultra portable hard drive;

   k. An Apple iPad;

   l. Three black jackets; and

   m. A black flat hat.

31. According to law enforcement databases, Belgian passport number EJ651433 belongs to a Belgian citizen whose name is not Antoine Nourrain and whose picture does not resemble VAZQUEZ's.

32. In the basement of VAZQUEZ's residence, the police found, among other things:

   a. Two printers (one color, one laser jet);

   b. An inkjet printer cartridge;

    c. A stack of blank cashier's check stock;

    d. Cashier's checks purporting to be from Suntrust Bank and PNC Bank;

    e. A box of vinyl gloves;

    f. Used vinyl gloves;

    g. A paper shredder;

    h. A bag containing banking and wire transfer papers; and

    i. A stack of blank United States Postal Service Priority Mail shipping labels.

33. Some of the cashier's checks found in the basement were clearly fraudulent. For instance, two of the checks purported to be purchased from PNC Bank, but both bore the same check number. They purported to have been purchased by the same person (Person 2) for the same amount ($44,850), and both contain a memo that says "[Person 2]/Donation." One check is made payable to a New Jersey provider of court-appointed advocates for children. The other is payable to a 501(c)(3) charitable organization, also in New Jersey, that helps chronically ill and disabled children.

34. In the master bedroom of VAZQUEZ's home, the police found, among other things:

    a. A suitcase containing $35,000 cash in separate bags and envelopes in the suitcase lining;

    b. $5,300 cash in a dresser drawer;

    c. Bank and wire transfer documents;

    d. A blue, self-inking stamp of the sort used to stamp passports, containing the phrases "Admitted NYC" and "Department of Homeland Security · US Customs and Border Protection";

    e. An adjustable date stamp; and

    f. A red ink pad.

35. Among the bank documents found in VAZQUEZ's home were documents from Bank of America, Bank of Canton, Citibank, Citizens Bank, Eastern Bank, People's United, Rockland Trust, Santander, TD Bank, and UBS. The documents related to accounts held in VAZQUEZ's name and in various of his aliases, including Nourrain and Hendrickx. Police also found receipts from MoneyGram, a service used to wire money. In the dining room of VAZQUEZ's home, police also found an HP laptop computer and a gray flat cap.

36. Among the documents found in VAZQUEZ's home were receipts from T-Mobile and MetroPCS. Both reflected the purchase and activation of an inexpensive, prepaid cell phone. The T-Mobile receipt is dated February 3, 2016 and is from a store at 1205 Hancock St. in Quincy, Massachusetts—approximately one mile from the Eastern Bank branch at which VAZQUEZ, using the name Daniel Hendrickx, opened two accounts on or about that same day. The MetroPCS receipt is dated January 12, 2016 and reflects a purchase by Antoine Nourrain of the Gardner St. address. The associated paperwork bears a phone number ending in 4287.

## Other Potentially Fraudulent Transactions

37. Queries of law enforcement databases for names and accounts associated with VAZQUEZ (including Nourrain, Hendrickx, and Person 1) returned complaints and reports dating back to August 2013, with potential victims in California, Colorado, Illinois, Oklahoma, Utah, Virginia, Washington, and France. Many of the complaints involved the transfer of money—or the attempt to have money transferred—to one of VAZQUEZ's aliases, including Nourrain and Hendrickx, after receiving a check that was later found to be fraudulent. Based on these complaints, I estimate that losses associated with VAZQUEZ's fraud scheme exceed $1 million, perhaps substantially.

## Conclusion

38. Based on my knowledge, training, and experience and the facts set forth in this affidavit, I have probable cause to believe, and I do believe, that, in or about and between August 2013 and February 2016, MANUEL PONCE VAZQUEZ committed mail fraud in violation of 18 U.S.C. § 1341.

Sworn to under the pains and penalties of perjury.

_Sheila Magoon_
Sheila R. Magoon, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me April 11, 2016

_Page Kelley_
The Honorable M. Page Kelley
United States Magistrate Judge

