UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                            )<br>                                                 )   Criminal No. 16-10209-IT<br>MANUEL PONCE VAZQUEZ,        )<br>a/k/a ANTOINE GERARD NOURRAIN,  )<br>a/k/a DANIEL DENNIS HENDRICKX    )<br>                                                 )<br>          Defendant                      ) | |

**Government's Second Supplemental Sentencing Memorandum**

This memorandum addresses two issues: (1) the information provided by the Bureau of Prisons regarding the defendant's medical condition and likely treatment in BOP custody and (2) restitution. As the government has argued in prior filings, the defendant's medical condition is not a reason to cut his sentence in half, from the Government's recommended 31 months to the 15 he has already served. Turning to restitution, the Court must order restitution equal to the value of the property lost as a result of the offense, plus "lost income . . . and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b), (c). In this case, the pecuniary loss to victims resulting directly from the offense is approximately $995,393.67, and restitution in at least this amount is required by the Mandatory Victim Restitution Act of 1996. Several victims have also claimed lost income and other expenses, as described below. If the Court agrees that all or some of those claims are covered by § 3663A and are sufficiently supported, the Court must add them to the restitution order as well.

*The Bureau of Prisons Report*

In response to the Court's order of February 14, 2017 (Dkt. 55), the BOP examined the defendant and produced a report provided to the Court and to the parties under seal. That report, dated May 4, 2017 (and filed under seal as Exhibit 1), indicates that Ponce Vazquez was admitted to FMC Devens on February 21, 2017, one week after the Court issued its order. His medical records show that he underwent studies and examinations in March and early April, with at least one consultation on May 2. *See* Ponce Vazquez FMC Devens Medical Records (filed under seal as Exhibit 2).

The BOP's report, authored by FMC Devens Clinical Director Dr. Berhan Yeh, noted that the defendant was examined by a physician and physical therapist at Devens, as well as by a neurosurgeon. Yeh Report (Ex. 1) at 1. Ponce Vazquez's medical records reveal that the neurosurgeon worked for UMass Memorial Medical Center, a partner of the University of Massachusetts Medical School. *See* Ex. 2 at 1. Several other physicians, including an orthopedist and another neurosurgeon, also examined him or were consulted about his case. *See* Ex. 2 at 5 ("Plan"). All but one of the doctors who examined Ponce Vazquez or his medical records recommended that he "undergo cervical spine surgery to stabilize his condition." Yeh Report at 2; *see* Ex. 2 at 5 ("Plan," describing majority and minority views).

To obtain information about the urgency for undergoing this procedure and the variables that might affect whether the defendant would get it in BOP custody, both government and defense counsel spoke with Dr. Yeh and BOP Regional Counsel Michael

Tafelski on May 19, 2017. Relevant portions of that conversation included, in summary, the following:[1]

- The doctors who recommended surgery to the BOP do not expect the surgery to help the defendant's current symptoms. The purpose of the surgery is to prevent worsening of his condition, which exhibits slow but progressive symptoms. Dr. Yeh described the recommended procedure as a "somewhat elective surgery," with leeway for when it should occur. Although he recognized that Ponce Vazquez is at greater than normal risk of a cervical neck injury, Dr. Yeh identified no extraordinary risks of waiting to obtain the recommended surgery. Dr. Yeh anticipates that, in BOP custody, Ponce Vazquez's condition would be classified as "Medically Necessary – Non-Emergent."
- In private care, if doctor and patient were to agree the recommended surgery should be performed, Dr. Yeh estimated that the surgery would likely be scheduled to occur within the next couple months.
- Once through the door at Devens (assuming Ponce Vazquez were designated to that facility), Dr. Yeh projected that it would take a month or two to get the defendant examined by a specialist. Assuming surgery remained the recommendation of the specialist (and was accepted by the patient), the defendant could potentially be booked for surgery within two-to-four months.
- Because Ponce Vazquez's condition would be classified as "Non-Emergent," any surgery scheduled by the BOP might be delayed by more urgent needs of other prisoners, including the need for emergency surgeries or operations for patients with acute conditions.
- When asked about recovery from the recommended surgery, Dr. Yeh described the following general recovery timeline, acknowledging that the defendant's particular course might be more difficult, given his prior surgeries: Within a few days, the patient would be ambulatory to the extent he was prior to surgery. He would undergo rehab exercises for several weeks under the supervision of a therapist and transition to home exercises around one month after surgery. Dr. Yeh estimated that the general recovery time was a couple months, by which time the patient should have returned to his baseline level of function.
- If the BOP had a year—assuming no complications, which Dr. Yeh acknowledged could exist, given Ponce Vazquez's prior surgeries—that should leave ample time to get the surgery performed and to allow Ponce Vazquez to undergo the rehabilitation necessary for him to be safely transferred out of BOP care (although Dr. Yeh also acknowledged that the actual course of that rehabilitation would be within the province of the neurosurgeon). Asked if that evaluation would remain true if Ponce Vazquez were only in BOP custody for eleven months rather than twelve, Dr. Yeh said it probably would.

---

[1] Before filing this summary of the conversation, government counsel submitted it to defense counsel for review and made edits in response to feedback from defense counsel.

- There is no guarantee that Ponce Vazquez would be designated to FMC Devens—limitations including lack of space might, in theory, prevent it—but when making the designation decision, the BOP will take into account his prior evaluation by members of the medical staff there and a judicial recommendation by the Court that he be designated to that facility (if there were such a recommendation).
- If Ponce Vazquez were designated to a different facility, Dr. Yeh projected that he would be evaluated by doctors in that community at a pace comparable to the pace at which he was evaluated at Devens in response to the Court's order.[2]

\*   \*   \*

Considered together with Dr. Yeh's report, these additional facts should reassure the Court that it can safely sentence Ponce Vazquez to 31 months of imprisonment without subjecting him to an unacceptable level of medical risk. In the time remaining on a 31-month sentence,[3] Ponce Vazquez is likely to receive the recommended surgery in BOP custody and complete the most critical portion of his rehabilitation. Ponce Vazquez will likely be designated to FMC Devens, to which he can be transferred quickly, particularly with a recommendation from the Court that he be sent there: with the help of outside specialists with whom the BOP contracts, Devens has the capacity to handle his medical condition, and the medical staff there is already familiar with his case. *See*

---

[2] As the government wrote in its most recent sentencing filing, each BOP prisoner receives an initial assessment "upon his/her arrival" at the designated institution. BOP Program Statement 6031.04, *Patient Care* (June 3, 2014) § 18(a) (Intake Screening) (available at https://www.bop.gov/policy/progstat/6031_004.pdf). Then, within fourteen days of an inmate's arrival, the BOP will conduct "an initial complete physical examination to determine medical needs." *Id.* § 19(b) (Physical Examinations). The speed with which the defendant's treatment proceeds after that will depend on the number and nature of additional tests the BOP doctors wish to perform.

[3] By the government's calculation, the time remaining on the defendant's sentence is almost exactly one year, assuming the defendant earns good time credit. (Without that credit, the sentence would be longer by almost another three months.) With a 31-month sentence, using the BOP methodology approved by the Supreme Court in *Barber v. Thomas*, 560 U.S. 474 (2010), the defendant could earn up to approximately 193 days of good-time credit under 18 U.S.C. § 3624(b)(1). Having been arrested on February 26, 2016, his expected release date would be approximately May 26, 2018.

18 U.S.C. § 3621(b) ("The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau," taking into account, among other things, "any statement by the court that imposed the sentence"). Once at Devens, if Dr. Yeh's estimates prove accurate, the defendant likely will receive the recommended surgery within six months (assuming he elects to have it),[4] a pace that would leave ample time for his recovery and would result in him obtaining the surgery at most four months later than he likely would have obtained it outside the BOP, if he sought surgery in the United States.[5] Even taking into account the uncertainties about what precise medical treatment Ponce Vazquez will receive in BOP custody and where he will receive it, there is no indication that the likely treatment will be inadequate to meet to his needs.

This Court should not make its sentencing determination based on Ponce Vazquez's desire to obtain treatment with the doctor of his choosing, especially when he has stated that he will refuse any neurosurgery in the United States (Ex. 1 to Dkt. 48 at 2). Notwithstanding the defendant's stated insistence upon surgery in Belgium, the BOP has demonstrated that it can "provide the defendant with needed . . . medical care." 18 U.S.C. § 3553(a)(2)(D). If the

---

[4] Even if Ponce Vazquez were sent to another facility, the record suggests the doctors there would be likely to recommend the same surgery. In addition to being recommended by the doctors most recently consulted by the BOP, surgery was also recommended and approved by the U.S. Marshals while the defendant was in their custody in 2016.

[5] The defendant has offered no estimate for the time it would take to obtain the surgery in Belgium, where he says he insists upon obtaining it (Ex. 1 to Dkt. 48 at 2: "Mr. Vazquez also stated that he had decided that he would not have any neurosurgery performed in the USA . . . ."). Any such estimate would need to take into account time in the custody of the Department of Homeland Security during removal proceedings and awaiting deportation. (During plea negotiations, Ponce Vazquez rejected a possible plea deal in which he would have agreed to a final order of deportation or removal order. It remains possible, therefore, that he will contest removal, lengthening the removal process.) As a Spanish citizen, the defendant will be removed to Spain, not to Belgium, further extending his wait.

Court imposes a 31-month sentence, that care is likely to include the surgery recommended by the doctors the BOP consulted. For those reasons, and for the reasons stated in the government's original sentencing memorandum and related filings (Dkts. 41, 45, and 48), the Court should impose the government's recommended sentence of 31 months.

*Restitution*

The full value of the lost property for which Ponce Vazquez is responsible is **$995,393.67**. Under § 3663A, the mandatory restitution order should be of at least this size.[6]

The Court must then increase the size of the restitution order if it finds that any additional losses claimed by victims are also compensable under § 3663A(b)(4). That section states that lost income and "other expenses" must be included in the restitution order if they were "incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4).

In letters to the government (filed under seal as Exhibit 3), five victims have claimed additional pecuniary losses, mostly for lost income. Listed here by victim (identified by VNS number), they are:

| Source | Victim Type | Claimed Loss Amount | Elements of Claim |
|---|---|---|---|
| VNS No. 5258799 | Non-profit | $622.27 | Lost time, including "communicating with the sheriff's office" |
| VNS No. 5258970 | Non-profit | $150 | Lost time |

---

[6] This is because the defendant was convicted of an offense against property under Title 18 committed by fraud or deceit in which identifiable victims suffered pecuniary loss, making restitution mandatory under 18 U.S.C. § 3663A. *See* §§ 3663A(a)(1) and (c). And because the case involved loss of property (as opposed to bodily injury), the restitution order must require the defendant to return the lost property or pay the victims its value. *See* § 3663A(b)(1).

| Source | Victim Type | Claimed Loss Amount | Elements of Claim |
|---|---|---|---|
| VNS No. 5258183 | Non-profit | $1,000 | Over 10 hours of lost time at a claimed rate of $100/hour |
| VNS No. 5258698 | Non-profit | $2,000 | Lost time |
| VNS No. 5258079 | Law Firm | $238,462[7] (reduced to $198,312.50 by subsequent time records) | Professional fees: $435<br>Bank fee: $12<br>Legal research: $515<br>Loss of Potential Revenue: $237,500 (including loss of time "to quickly resolve this situation with the help of law enforcement") |

Of these, only two victims (VNS No. 5258799 and No. 5258079) claimed lost income resulting from participation in the investigation or prosecution of the offense. The first victim, a non-profit, did not specify how much of that time was lost in communications with law enforcement, but the loss claim, relative to the total restitution figure in this case, was *de minimis* (just $622.27).

The claimed loss of income by VNS No. 5258079, a law firm, is much greater. At the government's request, the firm submitted a spreadsheet showing the firm's timekeeping records (filed under seal as Exhibit 4).[8] Whereas the original restitution claim for the law firm had estimated 500 hours of lost time, *see* Ex. 3, the timesheet reduced that number to

---

[7] This figure represents only additional expenses, including compensation for lost time. It excludes the money the law firm wired to the defendant, which constitutes proceeds of the crime and was included in the $995,393.67 pecuniary loss figure on the preceding page.

[8] A representative of VNS No. 5258079 has told the government that this spreadsheet contains the most detailed time records the firm has retained.

417.5 hours, *see* Ex. 4. At the firm's claimed, blended rate of $475 an hour, 417.5 hours of time translates into $198,312.50 in theoretically lost income.

Only a minority of entries on the timesheet reflect time participating in the investigation or prosecution of the defendant's crime, however. Some entries on the timesheet reflect time spent filing police reports and speaking with the police or the FBI. *See, e.g.*, Ex. 3 (February 3, 4 and April 21, 2016 entries for Associate Attorney 1). But those entries generally do not itemize how much time on a given day the members of the firm were engaged in those tasks as opposed to others related to the fraud.

For entries that fall within the coverage of § 3663A(b)(4), the Court may make a reasonable estimate of the victims' recoverable losses using the evidence provided. (As with the calculation of loss under the Guidelines, "absolute precision is not required when calculating restitution." *United States v. Mahone*, 453 F.3d 68, 74 (1st Cir. 2006).) The Court may reject any restitution request that is not supported by evidence, *see, e.g.*, *United States v. Edwards*, 19 F. Supp. 3d 366, 376 (D. Mass. 2014) (rejecting restitution requests that lacked "the necessary foundation" or were "seemingly arbitrary"), but a great deal of evidence is not required, *see, e.g.*, *United States v. Salas-Fernández*, 620 F.3d 45, 48 (1st Cir. 2010). The Court should make any determination of the final restitution amount by a preponderance of the evidence. *See* 18 U.S.C. § 3664(e).

If the Court awards restitution for lost time to VNS No. 5258079 (the law firm), it may also, in its discretion, order that this restitution be paid last—ordering instead that restitution be paid *pro rata* to all victims, including VNS No. 5258079, for the underlying fraud before any restitution payments are made to the law firm (or any other victim) for lost income. *See* 18 U.S.C. § 3664(i) (in cases with multiple victims, "the court may provide for a

different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim"). Given the number and nature of other victims; considering the amount of lost income claimed by VNS No. 5258079 relative to the losses suffered by others; and taking into account that full restitution is unlikely for any victim, this measure would help ensure that a greater number of victims recover as large a portion of their direct losses as is possible.

                                                           Respectfully submitted,

                                                           WILLIAM D. WEINREB
                                                           Acting United States Attorney

Dated: May 23, 2017        By:        */s/ Brian A. Pérez-Daple*
                                                           Brian A. Pérez-Daple
                                                           Assistant U.S. Attorney

## Certificate of Service

      I hereby certify that, on this day, I electronically filed the above document using the CM/ECF system, which should automatically send e-mail notification to the registered participants as identified on the Notice of Electronic Filing.

Dated: May 23, 2017                                       */s/ Brian A. Pérez-Daple*
                                                                     Assistant United States Attorney